<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SONIA CANDELARIA COSTA** | |
| *Plaintiff,* | **Civil Action No. 19-13389(FLW)** |
| **v.** | |
| **COMMISSIONER OF SOCIAL SECURITY,** | **OPINION** |
| *Defendant.* | |

<u>WOLFSON, CHIEF JUDGE</u>:

Sonia Costa ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Andrew Saul ("Defendant"), denying Plaintiff disability benefits under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and, accordingly, it is AFFIRMED.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on November 2, 1966, and was 45 years old on the alleged disability onset date of August 8, 2012. Administrative Record 41 (hereinafter "A.R."). Plaintiff has a tenth-grade educational level. A.R. 41. Prior to her alleged disability, Plaintiff worked as secretary. A.R. 42.

On September 3, 2015, Plaintiff applied for disability insurance benefits for her occipital neuralgia (a condition which causes pain in the upper neck and behind the head), depression, anxiety, hypertension, palpations, migraine headaches, blurred vision, gastroesophageal reflux disease ("GERD"), leaky heart valve minor, and right leg pain. A.R. 54, 68, 184-90. Plaintiff's

1

claims were denied on January 18, 2016, and again upon reconsideration on April 12, 2016.  A.R. 15.  Following the denials, Plaintiff requested a hearing, which was held on May 3, 2018, before ALJ Theodore Kim.  A.R. 14.  ALJ Kim determined that Plaintiff was not disabled and denied her claims for disability insurance benefits.  A.R. 29.  Plaintiff requested review by the Appeals Council and the request was denied on April 3, 2019.  A.R. 1-6.  Thereafter, on June 4, 2019, Plaintiff filed the instant appeal.

### A.   Review of the Medical Evidence

#### a.   The Evidence Reviewed by the ALJ

The medical record detailing Plaintiff's alleged disabling impairments is extensive.  On August 2, 2012—six days before Plaintiff's alleged disability onset date—Manish Viradia, M.D., examined Plaintiff, who complained of frequent "moderate to severe" headaches and severe neck pain.  A.R. 652.  Plaintiff stated to Dr. Viradia that she did not get enough sleep because of her migraine headaches and cared for a "very young child."  *Id.*  Plaintiff also claimed fatigue, vertigo, lightheadedness, and dizziness.  A.R. 653.  Dr. Viradia's report states that Plaintiff denied neck stiffness, neck tenderness, difficulty concentrating, memory difficulties, muscular weakness, anxiety, and depression.  A.R. 653-54.  Generally, Dr. Viradia observed that Plaintiff was in no acute distress, had a normal posture, and appeared well nourished.  A.R. 654.  Examining her neck, Dr. Viradia noted a normal range of motion, no tenderness, or deformities.  *Id.*  That same report described Plaintiff's heart as normal with a regular heart rate and rhythm, and no murmurs. *Id.*  Examinations of Plaintiff's right leg were normal.  A.R. 655.

On August 10, 2012, Dr. Viradia, again, examined Plaintiff and observed she suffered from increased headache and neck pain, poor "postural endurance, severe tenderness in her spine, decreased strength in her shoulder and elbows, with decreased range of motion that limited her

2

ability to carry objects, drive, sleep, conduct work on a computer and perform daily home activities. A.R. 659-60. He scheduled Plaintiff for two to three visits for four weeks for pain management, therapeutic exercises, postural stabilization, soft tissue mobilization, stretching, and a home exercise program. A.R. 660.

On August 15, 2012, MRIs performed by Mark Malzberg, M.D., on Plaintiff's spine and brain were reported as "unremarkable for the age of the patient" and "normal." A.R. 661. Dr. Malzberg's reports noted Plaintiff's "well aligned" and "normal" vertebrae. *Id.*

Plaintiff also saw Dipak Pandya, M.D., on September 27, 2012, who noted that Plaintiff complained of neck pain. A.R. 669. Dr. Pandya suggested injection therapy, but Plaintiff preferred pain medications. *Id.* Dr. Pandya prescribed her Primera and Flexeril. *Id.* Dr. Pandya's report noted Plaintiff's anxiety and nervousness, but that she "does not have [a] significant major medical problem." A.R. 664. The doctor later noted that physical therapy yielded "improvement" and was "helping." *Id.* Dr. Pandya opined that Plaintiff's headaches were "more consistent with common migraine." A.R. 668. Plaintiff was referred to physical therapy for her spine pain. *Id.*

Records from Plaintiff's physical therapy at Kessler Rehabilitation Center spanned from October 2012 through April 2013. A.R. 430-57. Those records detailed her cervical spine and headache complaints which Plaintiff stated stemmed from a fall down the stairs. A.R. 430. An October 2012 report noted that Plaintiff independently dressed herself "without difficulty"; had difficulty driving and "turning her head to the right"; could perform light housework; and limited her to lifting light weights occasionally. *Id.*

The physical therapy report from December 2012 compared Plaintiff's range of motion with the October 2012 report. A.R. 436. It shows that Plaintiff's spine extension and flexion remained at 100%. *Id.* Rotation in Plaintiff's spine and her ability to bend at her side improved

3

from 75% to 90%. *Id.* MaryBeth Campbell, P.T., noted that the "[o]verall rehabilitation potential is good." A.R. 437. Plaintiff's physical therapy results during the period of January through April 2013 remained consistent with earlier reports. A.R. 438-54.

Plaintiff next saw Dr. Pandya on July 18, 2013, who reported that Plaintiff stopped physical therapy and that her symptoms were "increasing neck pain, some left upper extremity pain, and shoulder pain." A.R. 670. Physical therapy, it was noted, "did help her." *Id.* Dr. Pandya opined that Plaintiff's migraines were "significantly better," but that she may have increasing pain with side-to-side neck movements. *Id.*

Plaintiff did not see Dr. Pandya again until March 2014, when Dr. Pandya reported that "patient states she is improving." A.R. 675. Dr. Pandya also noted that Plaintiff's daily headaches continued, but had no additional complaints. *Id.* Dr. Pandya noted an "underlying generalized anxiety disorder," but observed that Plaintiff "had been working [and] functioning well with limited amount of pharmacological management." A.R. 679. Dr. Pandya suggested nerve block or injection therapy if "current management" was not helping; Plaintiff maintained that she was "not ready for that type of intervention" and only sought physical therapy. *Id.* Another MRI was performed on March 19, 2014, which came back normal. A.R. 682.

In November 2015, Plaintiff saw examining physician Aleya Salam, M.D., who reviewed Plaintiff's x-rays and MRIs, and characterized them as "unremarkable," but noted that Plaintiff "has signs and symptoms of Fibromyalgi[a]." A.R. 701-04. Dr. Salam reported that Plaintiff's cervical spine appeared normal with a normal range of motion, but observed Plaintiff's "mild paraspinous muscle tenderness." A.R. 703. Dr. Salam recommended another cervical spine MRI, which Laura Klein, M.D., performed on November 18, 2015. A.R. 706. Dr. Klein's report indicated the MRI was normal and observed that her spine had an "[o]therwise … similar

4

appearance to the prior" MRI of Plaintiff's spine.  *Id.*  The following month, Dr. Pandya diagnosed Plaintiff with Fibromyalgia.  A.R. 711.  As for Plaintiff's complaints of blurred vision, Plaintiff was treated by Gerald Batt, M.D., in September 2012, March 2014, and October 2014.  A.R. 410-13.  Dr. Batt noted Plaintiff's migraines, and occipital neuralgia.  He also commented that Plaintiff has contact lenses but does not wear them and wrote "dry" and "itchy," and that Plaintiff uses glasses instead but does not need them to read.  *Id.*   In March 2014, Dr. Blatt observed that Plaintiff's distance visual acuity was 20/40 without glasses or contacts and 20/25-2 with corrective lenses.  A.R. 411.

On June 24, 2014, Plaintiff saw Martin S. Gizzi, M.D., and underwent a neuro-ophthalmic exam.  A.R. 373-74.  He expressed that the results were "essentially normal."  A.R. 373.  In his opinion, the evidence did not support "a diagnosis of optic neuritis or other optic neuropathy." A.R. 374.  Addressing her complaints of blurred vision, Dr. Gizzi commented that Plaintiff "simply needs optimal refraction."  *Id.*   Also, on October 15, 2015, Dr. Gizzi submitted a General Medical Report indicating he examined Plaintiff four times between December 2011 and October 2014. A.R. 406-09.  He noted Plaintiff had an MRI, "less headaches," and her occipital neuralgia.  A.R. 407.   He also noted that Plaintiff was "positive" for chest pain and heart palpitations, but that the palpitations "improved since last seen."  A.R. 595.

There were similar results present in Dr. Gizizi's January 19, 2015 report, which noted Plaintiff's nonlabored breathing, normal "[h]eart [s]ounds" with elevated blood pressure.  A.R. 591-93.  Plaintiff reported to Dr. Gizzi that she was "doing well" but "had recurrence of left-sided chest pain which comes and goes" over the preceding several months.  A.R. 591.  He recommended Plaintiff limit her salt intake and monitor her blood pressure, which she did "not check … on a regular basis as I asked her to."  *Id.*  Dr. Starcevio diagnosed her with a new onset of benign

hypertension.  *Id.*  An exercise stress test, performed by Dr. Starcevio on February 11, 2015, came back as normal.  A.R. 617.

Plaintiff saw cardiologist Dubravka Starcevio, M.D., on several occasions between 2010 and January 2015.  AR. 591-95, 617.  On January 27, 2012, Dr. Starcevio reported Plaintiff is "doing well" was "prediabetic" and occasionally "gets short of breath and chest pain with radiation down the left arm" that is not related to exertion and "happens at night and rest."  A.R. 594.

On January 4, 2016, state agency psychologist John J. Warren, Ph.D., reviewed the record for the period prior to Plaintiff's date of last insured, and concluded that Plaintiff was not disabled. Dr. Warren opined that Plaintiff had mild difficulties performing daily activities, functioning socially, and maintaining concentration, persistence, or pace, and did not find episodes of decompensation.  A.R. 60.  He found Plaintiff's anxiety/depressive symptoms were not severe.  *Id.*

On April 20, 2016, state agency psychiatrist Thomas Yared, M.D. similarly found Plaintiff suffered from "relatively mild anxiety/depressive symptoms" and had no history of "significant psychiatric illness/treatment."  A.R. 80.

On April 28, 2018, Victoria Chen, M.D., sent a letter in support of Plaintiff's application. A.R. 822.  Dr. Chen claimed she cared for Plaintiff since October 17, 2016, and Plaintiff had been "a patient of our practice since" March 6, 2013.  *Id.*  She noted Plaintiff's complaints of headaches, joint pains, muscle aches, and fatigue "with varying degrees of severity."  *Id.*  She opined that Plaintiff did not have "any significant improvement in her symptoms despite physical therapy and working with her specialists."  *Id.*  Dr. Chen spoke of Plaintiff's "fibromyalgia … that is interplaying with her depression and anxiety" as negatively impacting Plaintiff's quality of life and hampered her ability to perform "day-to-day tasks."  *Id.*  Dr. Chen also acknowledged that she did not know what Plaintiff's condition was "prior to her diagnosis of fibromyalgia and

depression." *Id.* Her letter states that she reviewed office notes "since establishing care," and that in her opinion, did not show Plaintiff improved with treatment. *Id.* However, she then acknowledged she was "not the principle[sic] provider" for Plaintiff's fibromyalgia and depression, and that "it would be helpful if her specialists would be able to offer an opinion as to whether or not her conditions warrant disability benefits." *Id.*

Also, in April 2018, Linda Esposito, PhD., sent a letter on Plaintiff's behalf stating that she had cared for Plaintiff since March 6, 2017. Dr. Esposito noted Plaintiff's initial complaints of "depression, fatigue, irritability, annoy[ance] with everything and chronic pain" and Plaintiff's report that "her symptoms began in 2009." A.R. 824. Dr. Esposito opined that Plaintiff suffered from fatigue, depression, achy joints, and lacked motivation and strength. *Id.* She "firmly" supported Plaintiff's application for disability benefits based on Plaintiff's "severe decline and dysfunction." *Id.* The foregoing represents the medical record that was before the ALJ at the time he rendered his decision.

### b.   *Plaintiff's Additional Evidence*

After Plaintiff sought this Court's review on June 4, 2019, from the Commissioner's final decision, Plaintiff filed additional medical records. Her filings consist of 362 additional pages. D.E. 6. The Commissioner objected to these documents, arguing the Court cannot consider them because they are prohibited by Local Civil Rule 9.1 and they fail to meet the standards under 42 U.S.C. § 405(g). D.E. 7. Plaintiff also filed a 26-page document that included additional medical records. D.E. 10. That evidence is dated on or after January 10, 2020. *Id.*

### B.  Review of Testimonial Record

### a.   *Plaintiff's Testimony*

Plaintiff appeared and testified at a hearing before the ALJ on December 14, 2017. A.R. 36-53. At the hearing, Plaintiff stated that she was a 51 years old woman whose relevant work

history included secretarial work.  A.R. 42.  She stated that her duties involved "calling insurance companies, setting up claims, files," pulling files and making copies, answering phones, and "scheduling appointments for … attorneys."  *Id.*

Plaintiff testified that she left her job in 2009 for "maternity leave" and was "diagnosed with postpartum depression."  *Id.*  She stated she lost her job after "being out for a couple months," and received a letter in the mail from her employer.  *Id.*  When asked by the ALJ what prevents her from working full time, Plaintiff discussed her fibromyalgia; pain in her back, neck, arm, and legs; and depression from which she suffered since 2009.  A.R. 44.  Plaintiff testified that she "just can't function right."  *Id.*

When asked if she had difficulty concentrating, Plaintiff said, "all the time."  *Id.*  She affirmed that she also had difficulty focusing and following directions.  *Id.*  Plaintiff testified that she gets anxiety being around people, and claimed she had a hard time communicating because of nervousness.  A.R. 45.

The ALJ's questioning then turned to Plaintiff's exertional limitations.  Plaintiff reported difficulty sitting for too long, which caused pain, and spends "most of [her] time laying down … sleeping a lot."  *Id.*  If she tried to go to work, Plaintiff stated she "would probably take a lot of breaks"; could not sit down for long due to her back and neck pain; and claimed that her foot and legs become swollen sometimes if she stands too long.  *Id.*

Plaintiff testified that she gets migraines that last for a couple of hours twice a week; spends "a lot of [her] days crying, depressed"; and her medications make her feel "foggy."  A.R. 46-47.

Plaintiff affirmed that she had been treating with a rheumatologist, psychiatrist, and orthopedist.  A.R. 47.  When asked by her attorney whether there has been any improvement as to her conditions, Plaintiff stated: "N[o] they just tell me to take Ibuprofen, he prescribed medication.

8

I take the Lyrica for pain.  And pretty much that's it and you know, I go to physical therapy, but then I stopped because of my fibromyalgia" due to pain.  *Id.*

### b.   *Vocational Expert's Testimony*

The vocational expert began his testimony by classifying Plaintiff's past work as "secretary" under Dictionary of Occupational Title ("DOT") number 201.362-030—considered a skilled occupation at the sedentary exertional level.  A.R. 49.   The ALJ then relayed three hypotheticals to the vocational expert.  The first hypothetical posited the following individual:

> [A]ssume an individual of the claimant's age, education and work experience, can perform at the light exertional level as defined by the regulations; and the individual can frequently operate hand controls, reach, handle, finger and feel with both upper extremities; the individual can occasional push or pull foot controls with both lower extremities; the individual can occasionally kneel, crouch, stoop, balance and crawl; can occasionally climb stairs and ramps; can never climb ladders, ropes and scaffolds and can never be exposed to unprotected heights and moving mechanical parts.  The individual can tolerate occasional exposure to vibration.  In addition, assume that the individual is able to understand, carry out and remember simple instructions and make simple work-related decisions.  Would the individual be able to perform the claimant's past relevant work either as actually performed or as that job is generally performed in the national economy?

A.R. 49-50.   The vocational expert responded "no" because "the hypothetical individual would be limited to simple work only," which precluded her from performing her past skilled work.  A.R. 50.   When asked if there were any jobs in the national economy or region Plaintiff could perform, the vocational expert answered in the affirmative.  *Id.*  In his opinion based on the above hypothetical, Plaintiff could perform three jobs: mail clerk, DOT 209.687.206; storage facility clerk, DOT 295.367-026; and garment sorter, DOT 222.687-014.  *Id.*  These positions, the vocational expert explained, were unskilled at the light exertional level.  *Id.*  The total number of

jobs available in the national economy for all three jobs was 129,000 according to the vocational expert.  A.R. 50-51.

The ALJ then asked a second hypothetical that incorporated the first hypothetical but included further limiting Plaintiff to: "[N]ever being exposed to strobe lights, flashing light or bright lights as in a theatre stage; assume the individual requires a moderate noise work environment as defined by the DOT and SCO (selected characteristics of occupations); the individual would be off task 5% of the workday…."  A.R. 51.  The vocational expert responded that the three jobs identified above "could be performed based upon" the second hypothetical.  *Id.* The vocational expert further commented that "off task and strobe lights, things of that nature are not specifically noted or addressed by those publications (meaning the DOT and SCO), so my testimony in those two areas would be based on my experience."  *Id.*

The ALJ asked a third hypothetical.   A.R. 51-52.  This time it incorporated the first two hypotheticals, except that it limited Plaintiff "to be off task 20% of the workday and absent from work two or more days per month…."  *Id.*  In response, the vocational expert stated that "these off task and absenteeism would preclude work" based on his experience as well.  A.R. 52.  He concluded that "employers generally have a tolerance" for employees who are off task "up to 9% of a normal workday" and who are consistently absent one day per month.  *Id.*

C.      **ALJ's Findings**

After the hearing, the ALJ issued a written decision on June 4, 2018, analyzing whether Plaintiff satisfied her burden of establishing disability using the standard five-step process.  A.R. 15-29.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date through the date of last insured—August 8, 2012 through December 31, 2014.  A.R. 17.

Second, the ALJ found that Plaintiff had the following severe impairments: cellulitis of the right upper arm; fibromyalgia; and cervical radiculopathy.   Third, the ALJ considered Plaintiff's mental and physical impairments, singly and in combination, against several the listed impairments in 20 C.F.R. part 404, subpart P, app. 1, and determined that Plaintiff did not have an impairment or combination of impairments.  A.R. 18-22.  The ALJ compared Plaintiff's mental impairments against Listings 12.04, depressive, bipolar and related disorders and 12.06, anxiety and obsessive-compulsive disorders.  A.R. 20.  The ALJ found that Plaintiff did not satisfy the "paragraph B" for those listings.  A.R. 20-21.  Plaintiff's physical impairments were then considered against Listings 1.00, musculoskeletal disorders**,** 1.02, major dysfunction of a joint(s), and 1.04, disorders of the spine, and the ALJ similarly found that Plaintiff's conditions did not rise to a level of severity those listings require.  A.R. 22.

Fourth, the ALJ determined that Plaintiff retained the RFC to perform light work under the following circumstances:

> [C]laimant could frequently operate hand controls, reach, handle, finger, and feel with both upper extremities.  The claimant could occasionally push or pull or operate foot controls with both lower extremities.  The claimant could occasionally kneel, crouch, stoop, balance, and crawl could occasionally climb stairs and ramps, could never climb ladders, ropes and scaffolds, and could never be exposed to unprotected heights and moving mechanical parts.  The claimant could tolerate occasional exposure to vibration. The claimant could never be exposed to strobe lights, to flashing lights or two bright lights, such as those found on a theatre stage.  The claimant required a moderate noise work environment, as defined in the DOT and SCO.  The claimant was able to understand, carry-out, and remember simple instructions, and make simple work-related decisions.  The claimant would be off task for five percent of the workday.

A.R. 22-23.  Fifth, taking into consideration Plaintiff's age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could

perform. A.R. 29. Relying on the testimony of a vocational expert, the ALJ determined Plaintiff could perform the following occupations: (1) mail clerk, DOT 209.687.206; (2) storage facility clerk, DOT 295.367-026; and (3) garment sorter, DOT 222.687-014. *Id.*

## II.   STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924, 113 S. Ct. 1294, 122 L. Ed. 2d 685 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's

decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. See 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…."  42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled.  *See* 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity."  *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits.  *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  These activities

13

include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show,

at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled.  *Id.*

III.    PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff challenges the ALJ's disability determination on three grounds.  First, Plaintiff contends the RFC was not based on substantial evidence.  Second, Plaintiff argues that the hypotheticals posed to the vocational expert did not include all of her alleged impairments.  Lastly, Plaintiff argues the ALJ failed to adequately evaluate all relevant evidence including Plaintiff's subjective complaints.

A.  Residual Functional Capacity Determination

Plaintiff first argues that the RFC was not based on substantial evidence.  She points to several purported errors: (1) the ALJ improperly gave great weight to two state medical consultants while placing little weight on the opinions of treating physicians; (2) failed to consider Dr. Linda Esposito's April 2018 letter[1]; and (3) "failed to consider the vocational expert's testimony that there would be no work available if Plaintiff was absent more than 1 day per month, or off task

---

[1] Plaintiff refers to an unspecified "report" from Dr. Esposito but does not cite to the record.  The ALJ similarly refers to a "report" from Dr. Esposito.  The Court construes that report as Dr. Esposito's April 2018 letter sent to the ALJ in support of Plaintiff's application for disability benefits.  Indeed, the Commissioner refers to this document as a "letter." Defendant's Brief, at 18-19. For clarity, the Court refers to this document as "Dr. Esposito's April 2018 letter."

15

more than 9% of the work day." Plaintiff's Brief, at 6. These arguments, however, are unconvincing.

First, Plaintiff takes issue with the ALJ assigning great weight[2] to the opinions of state agency psychologist and psychiatrist Drs. John Warren and Yared. Plaintiff's Brief, at 6; A.R. 27. Other than asserting the conclusory statement that the ALJ "improperly" assigned great weight to these opinions, Plaintiff does not explain why the ALJ's decision in this regard is erroneous. *See* Plaintiff's Brief, at 6. This failure, alone, dooms Plaintiff's argument.

Nevertheless, the ALJ provided his reasons for assigning significant weight to the opinions of Drs. Warren and Yared. Dr. Warren's January 2016 opinion found that Plaintiff suffered from "primarily somatic issues and some relatively mild anxiety and depression symptoms" between August 8, 2012 through December 31, 2014. A.R. 27 (citing A.R. 54-65). The ALJ concluded that Dr. Warren's opinion was consistent with the medical record. *Id.* The ALJ then gave Dr. Yared's opinion significant weight because it was "consistent with Dr. Warren's assessment." *Id.* I find that the ALJ credibly gave his reasons for assigning Dr. Warren's and Dr. Yared's opinions significant weight. *See* 20 C.F.R. § 416.927(e)(2)(i); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361–62 (3d Cir. 2011) ("State agent opinions merit significant consideration"); *Suarez v. Comm'r of Soc. Sec.*, 2018 WL 2059553 at *8 (D.N.J. May 3, 2018) (state agency expert "can

---

[2] Plaintiff argues the ALJ erred when assigning "great weight" to state agency medical consultants but does not specify the names of the medical consultants nor does Plaintiff cite to the opinions in the record. Based on his decision, the ALJ gave "great weight" to the opinions of State agency medical consultants Drs. Warren and Yared. A.R. 27. Also, the ALJ considered the opinions of other state agency medical consultants. The ALJ gave only "partial weight" to State agency consultants, Drs. Jose Rabelo and Deogracias Bustos. *Id.* Therefore, Plaintiff's argument in this regard is limited to those State agency medical consultants' opinions which were assigned "great weight"—Drs. Warren and Yared.

override the treating sources' opinions provided they are supported by substantial evidence in the record.").

Next, Plaintiff argues the ALJ did not consider Dr. Esposito's April 2018 letter.  Plaintiff's Brief, at 6.  Dr. Esposito was Plaintiff's psychologist who provided mental health treatment, and claimed she treated Plaintiff since March 6, 2017.  A.R. 824.  In her letter, Dr. Esposito stated that Plaintiff "reports chronic pain in her neck, back and legs…. [H]as fatigue, depression, achy joints, no motivation or strength.  She is eating 'poorly' and sleeping only 3 hours at night.  During the day she has limited energy.  Multiple medications have been tried yielding a limited to no response." *Id.*  Dr. Esposito opined that she "firmly" supported Plaintiff's application for disability benefits because of her "severe decline and dysfunction."  *Id.*

Contrary to Plaintiff's contention, the ALJ did consider Dr. Esposito's April 2018 letter.  In fact, the ALJ accorded Dr. Esposito's opinion "little weight," explaining that Dr. Esposito's April 2018 letter "was written well after the period under consideration."  A.R. 26.  *See* 20 C.F.R. § 404.131(a); *Matullo*, 926 F.2d at 244 (claimant must establish that [s]he is entitled to benefits prior to the expiration of h[er] insured status); *see also Ochs v. Comm'r of Soc. Sec.*, 187 F. App'x 186, 190 (3d Cir. 2006) ("The ALJ also properly limited the reports of Dr. Heller, Ochs's treating orthopedist, because they fell outside the relevant period . . .").  The ALJ also gave Dr. Esposito's opinion little weight because the doctor did not indicate that she reviewed the medical records to substantiate Plaintiff's claim that her symptoms began in 2009.  *Id.*  The ALJ acknowledged Dr. Esposito's support for Plaintiff's disability application, but explained that "determinations of disability are reserved to the Commissioner under 20 CFR 404.1527(d)."  *Id.*  Additionally, the ALJ discounted Dr. Esposito's opinion about Plaintiff's physical impairments, reasoning that she is only an acceptable medical source "with respect to her expertise as a psychologist."  *Id.* (citing

17

20 CFR 404.1527).  I am satisfied that the foregoing demonstrates that the ALJ articulated his reasoning based on substantial evidence, and in discounting Dr. Esposito's opinion, he specifically identified conflicting medical evidence.  I, therefore, find no error here.

Plaintiff's final argument regarding the RFC also lacks merit.  Plaintiff claims the vocational expert testified that "there would be no work available if Plaintiff was absent more than [one] day per month, or off task more than 9% of the [workday]."  Plaintiff's Brief, at 6.  This statement was based on one of the hypotheticals made by the ALJ.  But, according to the ALJ's RFC determinations, the vocational expert concluded that employers are generally *tolerant* of employees who are off task "up to 9% of a normal workday" and who are consistently absent one day per month.  *Id.*  As such, I reject this argument.

### B.  Hypothetical Questions Posed to the Vocational Expert

Plaintiff's next argument challenges the hypothetical questions the ALJ posed to the vocational expert at the hearing.   Plaintiff's Brief, at 7.  She claims that the ALJ failed to convey all her impairments concerning her ability to maintain concentration, persistence, and pace and unspecified "conditions and symptoms."  *Id.*

At the outset, I find this argument lacks any factual basis.  It is unclear from Plaintiff's argument what "conditions and symptoms" were supposedly left out of the ALJ's hypotheticals. She simply asks the Court to remand the matter for further development of the record of her limitations, but does not identify what those omitted limitations were or how she was harmed by their supposed omission.  Plaintiff's Brief, at 8.  Having reviewed the record, the Court finds that the ALJ's hypotheticals are supported by substantial evidence.

Indeed, an ALJ is not required to "submit to the vocational expert every impairment alleged by a claimant. Instead the directive . . . is that the hypotheticals posed must 'accurately portray' the claimant's impairments and that the expert must be given an opportunity to evaluate those impairments 'as contained in the record.' . . . Fairly understood, such references to all impairments encompass only those that are medically established." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (citation omitted)). The ALJ is required to consider the vocational expert's answer to the hypothetical as relevant only if it is supported by the ALJ's RFC analysis. *Johnson v. Comm'r of Soc Sec.*, 398 Fed. Appx. 727, 736 (3d Cir. 2010). "[W]here a limitation is supported by medical evidence, but is opposed by other evidence in the record, the ALJ has discretion to choose whether to include the limitation in the hypothetical." *Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014).

The ALJ, here, determined that Plaintiff had only non-severe mental impairments and mild limitations in concentration, persistence, or pace. A.R. 21. At the hearing, the ALJ asked the vocational expert to consider an individual capable of performing simple work at a light exertional level who could understand, carry-out, and remember simple instructions, make simple work-related decisions, and be off-task for five percent of the workday A.R. 28-29, 50-51. The vocational expert testified that an individual matching that description could perform the unskilled jobs of mail clerk, storage facility clerk, and garment sorter. A.R. 29, 50-51. This hypothetical corresponds to the RFC that the ALJ formulated. A.R. 22-23. Also, the ALJ specifically addressed Plaintiff's testimony that she has difficulty concentrating and focusing, but found her testimony less than entirely credible. A.R. 21. The medical record, the ALJ stated, does "not show that [Plaintiff] was unable to maintain concentration for eight hours a day for five days a week, or an equivalent work schedule." *Id.* (citing 20 SSR 96-8p). The ALJ also noted that Plaintiff drove,

19

cared for a child, and handled a checkbook.  *Id.*  Despite finding that Plaintiff did not suffer from a serve impairment in the functional area of concentration, persistence, and pace, the ALJ still accounted for Plaintiff's mild limitations by limiting her to being off task five percent of a given workday.  A.R. 22-23. This limitation was included in the ALJ's hypotheticals to the vocational expert.  A.R. 50-51.  Thus, the ALJ did not commit error in this context.

### C.  ALJ's Consideration of Plaintiff's Testimony and Treatment Records

Finally, Plaintiff contends the ALJ failed to adequately evaluate her complaints of pain and "mental/psychiatric conditions."  Plaintiff's Brief, at 8.  She argues the voluminous record shows that she "made probative statements throughout her treatment course" that the ALJ did not consider.  *Id.*  According to Plaintiff, "[i]t is simply impossible to ascertain whether the ALJ" considered or ignored Plaintiff's subjective statements.  *Id.*  I disagree.

The ALJ must consider and weigh all non-medical evidence before him, including claimant's allegations of pain.  *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000).  However, the alleged pain and other subjective symptoms "must be supported by objective medical evidence."  *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529).  When considering a claimant's allegations alongside the objective medical evidence, an ALJ has the authority to make credibility determinations of a plaintiff's testimony, specifically with regard to pain and other subjective complaints.  *Malloy v. Comm'r of Soc. Sec.*, 306 Fed. Appx. 761, 765 (3d Cir. 2009) (citing *VanHorn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)).  Credibility determinations turn on whether there are inconsistencies in the evidence, and whether there are conflicts between the claimant's statements and the objective evidence.  20 C.F.R. 404.1529(c)(4).  In that regard, the ALJ must establish the basis for concluding that a plaintiff's

testimony is not credible. *See Cotter v. Harris,* 642 F.2d 700 (3d Cir. 1981). Importantly, when reviewing a decision by an ALJ, this Court must defer to the ALJ's determinations on the credibility of the witnesses. *See Horodenski v. Comm'r of Soc. Sec.*, 215 Fed. Appx. 183, 188-89 (3d Cir. 2007); *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711, 718 (3d Cir. 2001) (Where the ALJ has articulated reasons supporting a credibility determination, that determination will be entitled to "great deference"); *Davis v. Califano*, 439 F. Supp. 94, 98 (E.D. Pa. 1977).

Here, the ALJ began by addressing Plaintiff's alleged migraine headaches and neck pain. A.R. 18. He provided specific reasons, supported by evidence, when he determined that Plaintiff's subjective complaints concerning the limitations imposed by her migraine headaches and neck pain were not entirely credible. A.R. 23. He noted Plaintiff's history of migraine headaches and occipital neuralgia, and compared it to other evidence in the record. A.R. 18-19. He concluded that for the period between August 8, 2012, through December 31, 2014, the medical record did not support a finding of a severe level of impairment "for a continuous 12-month period" as required by the Act. A.R. 18. The ALJ took on a comprehensive review of medical opinions from Plaintiff's treating physicians. *Id.* He noted that Plaintiff reported to a physical therapist in December 2012 that her migraine headaches "were controlled." *Id.* Her migraine headaches and neck pain were being treated with "over-the-counter medication and physical therapy." *Id.* The ALJ pointed to several of Plaintiff's MRIs, including Dr. Malzberg's August 2012 MRI of Plaintiff's spine and brain. A.R. 661-62. The ALJ noted that MRI was "[n]ormal and unremarkable." Also, a March 19, 2014 brain MRI "did not reveal any abnormality." *Id.* He further acknowledged that Plaintiff told Dr. Gizzi in June 2015 that "the severity of her orbital pain correlated with the severity of her occipital neuralgia." A.R. 18 (citing A.R. 373-74. The ALJ

21

concluded that Plaintiff's migraine headaches, neck pain, and occipital neuralgia only minimally limited her ability to perform basic work. A.R. 18-19.

The ALJ also addressed Plaintiff's "adult disability report" wherein she complained of right leg pain that stemmed from surgery, and rod pins placed to stabilize her tibia from past fractures of her tibia and fibula. A.R. 19 (citing A.R. 363-370, 378-90). The ALJ found no evidence that this past injury "more than minimally limited" Plaintiff's ability to perform basic work. Still, the ALJ explained that the RFC "accommodates the claimant's subjective allegation of chronic right leg pain", as it limits her to light work that precludes her from "more than occasionally" using her legs to operate foot controls; climb stairs or ramps; or perform other movements such as crouching and kneeling. *Id.*

Similarly, the ALJ fully explained his conclusions regarding Plaintiff's alleged mental impairments. A.R. 20-22. Despite Plaintiff's contention, the ALJ's decision reveals that he gave considerable attention to Plaintiff's subjective statements. *Id.* He concluded that Plaintiff's medically determinable mental impairments were non-severe under "any of the functional areas." A.R. 21 (citing 20 CFR 404.1520a(d)(1)). The ALJ found that Plaintiff did not "singly and in combination" meet or medically equal the criteria for Listings 12.04 and 12.06. A.R. 20. The ALJ considered the four broad areas of mental functioning under "paragraph B": (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.*

First, under the functional area understanding, remembering, or applying information, the ALJ concluded that Plaintiff only had a mild limitation. A.R. 21. The ALJ cited to Plaintiff's testimony about her activities, as well as her October 2015 function report when reaching this conclusion. *Id.* The ALJ considered Plaintiff's testimony that she drove to drop off and pick up

her daughter from school; could count change and "handle a checkbook/money order," but could not handle a savings account. *Id.* The ALJ explained that Plaintiff's medical records do not show a greater than mild limitation. *Id.*

Second, the ALJ found that Plaintiff had only a mild limitation in interacting with others. *Id.* The ALJ referenced Plaintiff's hearing testimony that she had difficulty interacting and communicating with others. *Id.* The ALJ compared this statement with other evidence in the record. *Id.* Again, pointing to Plaintiff's function report, the ALJ noted that Plaintiff "got along okay with authority figures"; was never laid off from a job for not getting along with others; acknowledged her statements of stress and anxiety; and that Plaintiff shopped in stores. *Id.* (citing A.R. 222-230).

Third, as noted in connection with the ALJ's consideration of Plaintiff's testimony regarding her ability to understand, remember, and apply information, *supra*, the ALJ explained that while the Plaintiff complained of having difficulty concentrating and focusing, her activities such as driving, caring for her child, and handling a checkbook showed Plaintiff had only a mild limitation in this area and that did not preclude her from performing unskilled work. A.R. 21. Nevertheless, the ALJ accommodated for Plaintiff's complaints of pain and allowed her to be off-task at work for five percent of a workday. *Id.*

Finally, the ALJ found that Plaintiff's testimony that she cared for her child, "had no problems with personal care," was capable of driving, and did "not show that her limitation … was greater than mild." *Id.* In other words, the ALJ found that Plaintiff demonstrated an ability to manage herself and determined that she suffered only mild limitations in this respect, as well.

What is more, Plaintiff offers no support for her bare assertions that the ALJ disregarded her subjective complaints of pain and mental impairments. She does not explain what supposed

probative statements she made during her years of treatment that the ALJ failed to consider.  She does not point to specific evidence in the record that the ALJ ignored.  In sum, I find that the ALJ appropriately considered Plaintiff's subjective complaints and balanced her subjective complaints against other objective medical evidence in his decision—a decision that was based on substantial evidence.  Accordingly, I will not disturb the ALJ's decision on this ground.

### D.  Plaintiff's Additional Evidence

Before concluding, the Court also addresses Plaintiff's attempt to introduce additional medical records that included 362 additional pages on March 31, 2020 and 26-page document on June 24, 2020.  D.E. 6; D.E. 10.  Plaintiff argues that her additional disclosures are made pursuant to Federal Rule 26 (a)(1) and she "reserves the right to supplement" the disclosures "during the course of continuing discovery."  D.E. 6, at 1.  Plaintiff, however, is mistaken.  This is not an issue that concerns the rules of discovery.

Instead, the issue of new evidence in this appeal is governed by the requirements of supplementing the administrative record under sentence six of 42 U.S.C. § 405(g).  Under the statute, the district court *may* order a remand to address new evidence if the claimant satisfies *Szubak's* threefold test.  *See Szubak v. Secretary of HHS*, 745 F.2d 831, 833 (3d Cir. 1984) (*per curium*); *see also* 42 U.S.C. § 405(g).  Evidence that was not originally included in the record for the ALJ's review must be: (1) "new" and (2) "material," and (3) the claimant must show "good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.* Evidence is "new" when it was not previously included in the record and is "not merely cumulative of what is already in the record."  *Id.*  The evidence is "material" if it relates to the period encompassing the denial of benefits and raises the possibility that the new evidence would have

changed the outcome of the Commissioner's decision. *Id.* "An implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id.* (citation omitted).

A review of the additional evidence makes clear that Plaintiff cannot satisfy this test. First, some of the additional evidence is cumulative and fails the first prong. For instance, Plaintiff includes additional reports from Dr. Pandya, who treated Plaintiff for her neck pain and migraines, from August 22, 2019. D.E. 6, at 39-44. In Dr. Pandya's August 2019 report, he noted Plaintiff still had headaches and dizziness. *Id.* at 39. He also noted she was in "[n]o acute distress. Well nourished. Well developed." *Id.* at 40-41. He assessed her with the "[c]ommon migraine", and "negative" for decreased activity and fatigue. *Id.* These more recent reports from Dr. Pandya are consistent with his earlier opinions that the ALJ reviewed from September 2012, July 2013, and March 2014. A.R. 20; A.R. 664-668, 673-75, 678, 684-689. Dr. Pandya's earlier reports noted Plaintiff's anxiety and nervousness, and concluded that she "does not have [a] significant major medical problem." A.R. 664. Dr. Pandya also noted that physical therapy yielded "improvement" and was "helping." *Id.* Dr. Pandya opined that Plaintiff's headaches were "more consistent with common migraine." A.R. 668.

Other additional evidence from David Abrutyn, M.D., who treated Plaintiff for shoulder pain in May 2019, describes Plaintiff as "healthy appearing with normal body habitus in no apparent distress"; having "[n]o active history of depression or fatigue"; and Plaintiff denying chest pain dizziness, or headaches. D.E. 6, at 51. Another report from August 14, 2019, describes an MRI of Plaintiff's "internal auditory canals" and brain as "normal" and "unremarkable." D.E. 6, at 37-38. Also, Plaintiff includes a letter from Dr. Chen that is dated June 6, 2019. D.E. 6, at

58-59.   The opinion that Dr. Chen expressed in her June 2019 letter is nearly identical to the opinion she expressed in her April 28, 2018 letter that the ALJ reviewed.  *Id.*; A.R. 25; A.R. 822. In fact, the only difference between Dr. Chen's letters is an additional paragraph included at the end of the June 2019 letter which adds Dr. Chen's opinion that Plaintiff "is disabled" and "[h]er fatigue and pain prevent her from doing any lifting or tasks for [a] prolonged period of time."  *Id.* This paragraph, however, does not change the outcome.  As the ALJ explained in his decision, determinations of disability are reserved to the Commissioner under 20 CFR 404.1527(d).  A.R. 26.  Furthermore, Dr. Chen's opinion regarding Plaintiff's fatigue and depression is contradicted by the May 2019 report from Dr. Abrutyn, *supra*.  Therefore, while this evidence was not previously included in the record, it is cumulative.

Plaintiff also includes additional evidence that is not material.  Plaintiff offers several reports from physicians at Atlantic Health System.  D.E. 6, at 228-242.  A report from Nicholas Avalonne, M.D., on October 10, 2019, notes that Plaintiff was "present for new patient initial consultation" for pain in her left shoulder.  D.E. 6, at 228.  Another report comes from James Witting, M.D., who performed surgery on Plaintiff's left shoulder on October 15, 2019.  D.E. 6, at 235-237.   Notably, this evidence did not exist at the time the Commissioner's decision became final on April 3, 2019.  Indeed, these reports are over four years past Plaintiff's last date of insured—December 31, 2014.  In other words, this is not additional evidence the ALJ or appeals council could have considered.  Importantly, this evidence relates to Plaintiff's complaints of, and treatment for, left shoulder pain.  Plaintiff, however, did not allege left shoulder pain as a disabling impairment in her application for disability benefits and any subsequent deterioration of her left shoulder is immaterial to this case.  A.R. 54, 68.

Plaintiff also fails to show good cause under prong three. Courts have required claimants to "provide a logical reason [as to] why the proffered additional evidence was not, or could not have been, presented to the Secretary for inclusion in the record during the administrative proceedings." *DeMoss v. Heckler*, 706 F. Supp. 303, 309 (D. Del. 1988); *see also Szubak*, 745 F.2d at 834 ("A claimant might be tempted to withhold medical reports, or refrain from introducing all relevant evidence, with the idea of obtaining another bite of the apple if the Secretary decides that the claimant is not disabled.").

Here, some additional evidence offered by Plaintiff did exist prior to the date the Commissioner's decision became final and relates to the period encompassing the denial of benefits. For example, Plaintiff asks the Court to consider reports from Dr. Esposito that began on April 23, 2018. D.E. 6, at 80-172. As addressed earlier, the original record included a letter from Dr. Esposito dated April 9, 2018. A.R. 824. The ALJ gave several reasons for discounting Dr. Esposito's April 2018 letter, which stated that Dr. Esposito began treating Plaintiff on March 6, 2017. A.R. 26.

Plaintiff, however, fails to show that good cause exists to consider additional Dr. Esposito reports. Plaintiff does not explain why those reports were not presented to the Commissioner during the administrative appeals process. Plaintiff also does not explain why there are no reports from Dr. Esposito that predate April 2018, despite Dr. Esposito's claim that he treated Plaintiff since March 2017. Furthermore, Plaintiff offers no explanation why Dr. Esposito's April 2018 letter was included in the record, but not his medical reports. Curiously, Plaintiff does not cite in her brief to a single document that was offered as supplementation. Also, conspicuously absent is any argument that the supplemental evidence might somehow change the outcome. Without any explanations as to the probative value of the evidence, Plaintiff's attempt to wedge these reports

into the record at this juncture appear more like an effort to obtain the proverbial second bite of the apple, rather than a good cause mistake.  Indeed, these circumstances fall short of meeting the good cause standard, and Plaintiff's attempt to supplement the record is denied.  *Szubak*, 745 F.2d at 833 ("claimants should generally be afforded only one fair opportunity to demonstrate eligibility for benefits under any one set of circumstances.").

### III.   CONCLUSION

For the reasons set forth above, the Court finds that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed. An appropriate Order shall follow.

Date: April 23, 2021                                    **/s/ Freda L. Wolfson**
                                                     **Hon. Freda L. Wolfson**
                                                     **U.S. CHIEF DISTRICT JUDGE**